# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

GENWORTH FINANCIAL, INC.,      )
GENWORTH LIFE INSURANCE        )
COMPANY, and GENWORTH LIFE     )
INSURANCE COMPANY OF NEW       )
YORK,                          ) C.A. No. N22C-05-057 EMD CCLD
                               )
        Plaintiffs,            )
                               )
    v.                         )
                               )
AIG SPECIALTY INSURANCE        )
COMPANY, AXIS INSURANCE        )
COMPANY, U.S. SPECIALTY        )
INSURANCE COMPANY, FREEDOM     )
SPECIALTY INSURANCE COMPANY,   )
ACE AMERICAN INSURANCE         )
COMPANY, CONTINENTAL           )
CASUALTY COMPANY, ATLANTIC     )
SPECIALTY INSURANCE COMPANY,   )
and ARGONAUT INSURANCE         )
COMPANY,                       )
                               )
        Defendants.            )
                               )

Submitted:  June 22, 2023
Decided: September 21, 2023

*Upon Plaintiffs' Motion for Partial Summary Judgment*
***GRANTED, in part, and DENIED, in part***

*Upon Defendants' Motion for Summary Judgment*
***DENIED***

Jennifer C. Wasson, Esq., Carla M. Jones, Esq., Potter Anderson & Corroon LLP, Wilmington, Delaware, Kenneth H. Frenchman, Esq., Michelle R. Migdon, Esq., Orrie A. Levy, Esq., Samantha Smith, Esq., Cohen Ziffer Frenchman & McKenna LLP, New York, New York, *Attorneys for Plaintiffs.*

Kurt M. Heyman, Esq., Aaron M. Nelson, Esq., Kelly E. Rowe, Esq., Heyman Enerio Gattuso & Hirzel LLP, Wilmington, Delaware, Scott B. Schreiber, Esq., Arthur Luk, Esq., William C.

Perdue, Esq., Samuel I. Ferenc, Esq., Matthew Bemis, Esq., Arnold & Porter Kaye Scholer LLP, Washington, D.C., *Attorneys for Defendant AIG Specialty Insurance Company.*

John C. Phillips, Jr., Esq., David A. Bilson, Esq., Phillips McLaughlin & Hall, P.A., Wilmington, Delaware, *Attorneys for Defendants U.S. Specialty Insurance Company and Argonaut Insurance Company.*

Douglas M. Mangel, Esq., Michelle Beecy, Esq., Clyde & Co LLP, Washington, D.C., *Attorneys for Defendant U.S. Specialty Insurance Company.*

Geoffrey W. Heineman, Esq., Jung H. Park, Esq., Ropers Majeski, PC, New York, New York, *Attorneys for Defendant Argonaut Insurance Company.*

Robert J. Katzenstein, Esq., Julie M. O'Dell, Esq., Smith Katzenstein & Jenkins LLP, Wilmington, Delaware, *Attorneys for Defendants AXIS Insurance Company, Continental Casualty Company, and Atlantic Specialty Insurance Company.*

Matthew Beato, Esq., Jason Cronic, Esq., Jessica N. Gallinaro, Esq., Wiley Rein LLP, Washington, D.C., *Attorneys for Defendant AXIS Insurance Company.*

Karen H. Ventrell, Esq., CNA Corporate Litigation, Washington, D.C., *Attorney for Defendant Continental Casualty Company.*

Scott A. Schechter, Esq., Matthew Mawby, Esq., Kaufman Borgeest & Ryan LLP, Valhalla, New York, *Attorneys for Defendant Atlantic Specialty Insurance Company.*

John G. Day, Esq., Bruce E. Jameson, Esq., Prickett, Jones & Elliott, P.A., Wilmington, Delaware, Alexis J. Rogoski, Esq., Edward C. Carleton, Esq., Skarzynski Marick & Black LLC, New York, New York, *Attorneys for Defendant Freedom Specialty Insurance Company.*

John L. Reed, Esq., DLA Piper LLP (US), Wilmington, Delaware, Steven J. Brodie, Esq., Carlton Fields, P.A., Miami, Florida, Charles W. Stotter, Esq., Carlton Fields, P.A., New York, New York, *Attorneys for Defendant ACE American Insurance Company.*

**DAVIS, J.**

## I.      INTRODUCTION

This is an insurance coverage dispute alleging claims for breach of contract, anticipatory breach of contract and declaratory relief assigned to the Complex Commercial Litigation Division of this Court.  On May 9, 2022,  Plaintiffs Genworth Financial, Inc. ("GFI"), Genworth Life Insurance Company ("GLIC"), and Genworth Life Insurance Company of New York

("GLICNY") (collectively, "Genworth") commenced this action against Defendants AIG Specialty Insurance Company ("AIG"), Axis Insurance Company ("Axis"), U.S. Specialty Insurance Company ("U.S. Specialty"), Freedom Specialty Insurance Company ("Freedom Specialty"), Ace American Insurance Company ("Ace"), Continental Casualty Company ("CNA"), Atlantic Specialty Insurance Company ("Atlantic"), and Argonaut Insurance Company ("Argonaut") (collectively, "Insurers"). On September 21, 2022, Genworth filed an Amended Complaint.[1] The Amended Complaint sets out three claims against the Insurers: (i) breach of contract and/or anticipatory breach of contract for defense costs; (ii) breach of contract and/or anticipatory breach of contract for indemnity; and (iii) certain declaratory relief.

Subsequently, Genworth moved for partial summary judgment (the "Genworth Motion") on October 3, 2022.[2] On December 1, 2022, Insurers filed their own motion for summary judgment (the "Insurers Motion").[3] The Court held a hearing on these motions on June 22, 2023.[4] At the end of the hearing, the Court took the Genworth Motion and the Insurers Motion under advisement.

For the reasons stated below, the Genworth Motion is **GRANTED**, in part, **DENIED**, in part, and the Insurers Motion is **DENIED**.

## II.  RELEVANT FACTS

### A. PARTIES

GFI is a Delaware corporation with its principal place of business in Virginia.[5] GLIC is a Delaware corporation with its principal place of business in Virginia.[6] GLICNY is a New York

---

[1] D.I. No. 62.
[2] D.I. No. 63.
[3] D.I. No. 67.
[4] D.I. No. 96.
[5] Amended Complaint ("Amend. Compl.") ¶ 10.
[6] *Id.* ¶ 11.

corporation with its principal place of business in New York.[7] Genworth is a financial, retirement, and life insurance company which sells financial and retirement products, including long-term care ("LTC") insurance plans.[8] LTC insurance "seeks to minimize the cost of nursing home care, home care, assisted living care, and other specialized care designed for individuals unable to perform the basic functions of daily living (such as dressing, bathing, eating and continence, among other things)."[9]

Insurers are engaged in the business of selling insurance, investigating claims, and issuing policies that cover policyholders in the State of Delaware, amongst other states. AIG is an Illinois corporation with its principal place of business in New York.[10] Axis is also an Illinois corporation with its principal place of business in Georgia.[11] U.S. Specialty is a Texas corporation with its principal place of business in Texas.[12] Freedom Specialty is an Ohio corporation with its principal place of business in Ohio.[13] Ace is a Pennsylvania corporation with its principal place of business in Pennsylvania.[14] Like AIG and Axis, CNA is an Illinois corporation. [15] CNA has it principal place of business in Illinois.[16] Atlantic is a New York corporation with its principal place of business in Minnesota.[17] Argonaut is an Illinois corporation with its principal place of business in Texas.[18]

---

[7] *Id.* ¶ 12.
[8] *Id.* ¶ 24.
[9] *Id.* ¶ 41.
[10] *Id.* ¶ 13.
[11] *Id.* ¶ 14.
[12] *Id.* ¶ 15.
[13] *Id.* ¶ 16.
[14] *Id.* ¶ 17.
[15] *Id.* ¶ 18.
[16] *Id.*
[17] *Id.* ¶ 19.
[18] *Id.* ¶ 20.

## B. THE INSURANCE POLICIES

As part of its risk management efforts, Genworth annually purchased primary and excess professional liability insurance.[19]  The Amended Complaint alleges that Genworth purchased the insurance to insure against third-party claims, including those seeking damages and other relief as a result of Genworth's alleged misrepresentations and other professional errors or omissions.[20]  During the relevant period, Genworth was covered under a professional liability coverage tower from March 31, 2018 to March 31, 2019 (the "Policies").[21]  The Policies provided approximately $80 million in liability coverage from nine[22]  layers of insurance in excess of Genworth's $25 million in self-insured retention amount.[23]  The Policies followed form to the first layer liability policy sold by the primary carrier, AIG.[24]  The Policies include a Virginia choice of law provision.[25]

AIG provided the first layer insurance policy (the "Primary Policy") not exceeding $10 million in coverage beyond Genworth's $25 million self-insured retention amount.[26]  Axis provided the second layer insurance policy not exceeding $10 million in coverage beyond $10 million in liability.[27]  U.S. Specialty provided the third layer insurance policy not exceeding $15 million in coverage beyond $20 million in liability.[28]  Freedom Specialty provided the fourth layer insurance policy not exceeding $10 million in coverage beyond $35 million in liability.[29]

---

[19] *Id.* ¶ 25.

[20] *Id.*

[21] *Id.* ¶ 26.

[22] The Amended Complaint alleges nine layers; however, the Complaint—when describing the layers—skips from seven to nine.  This discrepancy (real or imagined) is not meaningful to the decision here.

[23] *Id.*

[24] *Id.* ¶ 27.

[25] Insurance Company Professional Liability and Fiduciary Liability ("Primary Policy"), Endorsement #8 (D.I. No. 64, Ex. 1)..

[26] Amend. Compl. ¶ 28.

[27] *Id.*

[28] *Id.*

[29] *Id.*

5

Ace provided the fifth layer insurance policy not exceeding $10 million in coverage beyond $45 million in liability.[30] CNA and Atlantic provided the sixth layer insurance policies issued not exceeding $5 million each in a quota share ($10 million in total) in coverage beyond $55 million in liability.[31] Argonaut provided the seventh layer insurance policy not exceeding $10 million in coverage beyond $65 million in liability.[32] CNA provided the ninth layer insurance policy not exceeding $5 million (as a part of a $10 million quota share) in coverage beyond $90 million in liability.[33]

## C. THE PRIMARY POLICY

The Insuring Clause of the Primary Policy provides that:

Underwriters shall pay on behalf of the **Insureds Loss** which the **Insureds** become legally obligated to pay by reason of any **Claim** first made by: 1) a policyholder; 2) third-party client of the **Company**; 3) mortgagor/borrower in connection with a private mortgage insurance **Policy**; or 4) **Prospective Policyholder** or **Prospective Third-Party Client**, but solely with respect to **Defense Costs**, against the **Insureds** during the **Policy Period** or an applicable **Discovery Period** for any **Wrongful Acts** by the **Insureds** or by a person or entity for whom the **Insureds** are legally responsible in rendering or failing to render **Professional Services**, if such **Wrongful Acts** take place prior to the end of the **Policy Period**.[34]

The Primary Policy defines "**Insured Person**" as the "**Company**," which is defined to include the "**Parent Company** and **Subsidiaries**."[35] The "**Parent Company**" is defined as GFI.[36] "**Subsidiary**" is defined as any entity "of which the Company has Management Control, i.e., GLIC and GLICNY.[37] "**Claim**" is defined as "a written demand for monetary or non-monetary

---

[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* Two eighth layer insurance policies and the other half of the ninth layer insurance policy are not included in the lawsuit due to mandatory arbitration provisions. Amend. Compl. at 12, n.2.
[34] Primary Policy at 17.
[35] Amend. Compl. ¶ 30, Primary Policy at 1.
[36] Primary Policy at 3.
[37] *Id.* at 4.

damages or injunctive relief" or "a civil proceeding commenced by the service of a complaint or similar pleading."[38]

"**Loss**" is defined as:

[T]he amount which the **Insureds** become legally obligated to pay on account of each **Claim** and for all **Claims** in the **Policy Period** . . . made against them for **Wrongful Acts** for which coverage applies, including, but not limited to, damages, judgments, any award of pre-judgment and post-judgment interest, settlements and **Defense Costs**. **Loss** does not include (1) any amount for which the **Insureds** are absolved from payment, (2) taxes, fines or penalties imposed by law, or (3) matters uninsurable under the law pursuant to which this **Policy** is construed.

**Loss** shall also mean punitive, exemplary or multiple damages to the extent such damages are insurable under the internal laws of any jurisdiction most favorable to the insurability of such damages, and which has a substantial relationship to either the **Insureds**, Underwriters, this **Policy** or such **Claim**.[39]

"**Defense Costs**" is defined as "reasonable costs, charges, fees (including but not limited to attorneys' fees and experts' fees) and expenses . . . incurred by the **Insureds** in defending or investigating **Claims** and the premium for appeal, attachment or similar bonds."[40]

"**Professional Services**" is defined as:

[S]ervices, including but not limited to investment advisory services and investment management services, performed by or on behalf of the **Company** for: 1) a policyholder; 2) third-party client of the **Company**; 3) mortgagor/borrower in connection with a private mortgage insurance policy; or 4) solely with respect to **Defense Costs**, **Prospective Policyholder** or **Prospective Third-Party Client**. The **Professional Services** must be performed in connection with the sales and marketing of insurance and investment products and/or a written contract or policy with such or to be issued to such policyholder, **Prospective Policyholder**, third-party client or **Prospective Third-party Client**. A written contract shall include an insurance **Policy** issued by the **Company**.[41]

---

[38] *Id.* at 18.
[39] *Id.* at 19.
[40] *Id.* at 2.
[41] *Id.* at 19.

"**Prospective Policyholder**" or "**Prospective Third-Party Client**" is defined as "someone who has actually submitted an application for coverage or other application seeking the performance of a **Professional Service** from the **Insured** or inquired thereto."[42]

"**Wrongful Act**" is defined as "any error, misstatement, misleading statement, act, omission, neglect or breach of duty actually or allegedly committed or attempted . . . by the Company or by any person or organization for whom the Insureds are legally responsible."[43]

The Primary Policy also provides that in relation to claims:

> For purposes of this **Policy**, all **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** of the **Insureds** shall be deemed one **Claim**, and such **Claim** shall be deemed to be first made on the date the earliest of such **Claims** is first made against them, regardless of whether such date is before or during the **Policy Period**. All **Loss** resulting from a single **Claim** shall be deemed a single **Loss**.[44]

"**Interrelated Wrongful Acts**" is defined as "all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of related facts, circumstances, situations, events, transactions or causes."[45]

### D. THE COVERAGE EXCLUSIONS

The Primary Policy (and the other policies in the insurance coverage ladder) excluded certain types of claims from coverage.

Section III(A)(19) (the "Underwriting Exclusion") states:

> [Underwriters shall not be liable for that portion of **Loss** on account of any **Claim** made against any **Insured**] based upon, arising out of or attributable to the underwriting of insurance, including any decisions involving the classification, selection, and renewal of risks as well as the rates and premiums charged to insure or reinsure risks; Notwithstanding the foregoing, this exclusion shall not apply to **Claims** arising out of the sale and marketing of insurance or investment products.[46]

---

[42] *Id.*
[43] *Id.* at 20.
[44] *Id.* at 5.
[45] *Id.* at 3.
[46] *Id.* at 24.

Section III(A)(20) (the "Premium Exclusion") states:

[Underwriters shall not be liable for that portion of **Loss** on account of any **Claim** made against any **Insured**] if such **Loss** constitutes: . . . (iii) premiums, return premiums or commissions; but this exclusion shall not apply to **Defense Costs**.[47]

Section III(A)(23) (the "Claim Reserves Exclusion") states:

[Underwriters shall not be liable for that portion of **Loss** on account of any **Claim** made against any **Insured**] based upon, arising out of or attributable to (i) the inadequacy of any claim reserves of the **Company** or any entity to which the **Insureds** provide **Professional Services**; or (ii) the bankruptcy, insolvency, receivership, liquidation or financial inability of any entity to which the **Insureds** provide **Professional Services** to pay claims or perform **Professional Services**.[48]

## E. THE UNDERLYING CLASS ACTION LAWSUITS

### 1. The Skochin Action

On January 18, 2019, Jeremy Skochin, Susan Skochin, and Larry Huber (the "Skochin Plaintiffs") filed a class action lawsuit ("Skochin Action") against Genworth. The Skochin Action alleged that Genworth "made partial or inadequate disclosures of material information and/or omissions of material information regarding potential or likely future rate increases that it expected or planned to make in multiple subsequent years" which "affected [the Skochin Plaintiffs'] ability to make informed decisions regarding policy options and policy renewal each year."[49] The Skochin Plaintiffs claimed that when they entered into the LTC policy, Genworth failed to inform them of Genworth's existing plans to increase the premium rates from 44-60% in the near future.[50] The Skochin Plaintiffs also contended that in 2018, Genworth sent a rate increase letter noting that Genworth planned on increasing the premium 150% over the following 6-8 years, while Genworth's internal projections showed that the rate of increase was expected to

---

[47] *Id.* at 25.
[48] *Id.* at 26.
[49] Amend. Compl. ¶¶ 43, 47.
[50] *Id.* ¶ 43.

be closer to 300%.[51] The Skochin Plaintiffs, however, did not challenge Genworth's right to increase premiums if such increases were made across entire policy classes, and approved by the policyholders' state insurance regulators.[52]

On October 30, 2019, the Skochin Action parties filed a Notice of Settlement and executed a class action settlement agreement on December 20, 2019 (the "Skochin Settlement").[53] The terms of the Skochin Settlement provided that Genworth would send a "Special Election Letter" to all settlement class members which provided disclosures about future rate increases and the financial condition of Genworth.[54] The Skochin Settlement also offered certain "Special Election Options" which the class members could select from in light of these updated disclosures for future premiums.[55] One of the Special Election Options was a "damages payment" payable to the class member which was calculated in various ways, including: (i) a calculation of "premiums paid previously;" (ii) "future reduced benefit premiums as a basis for calculating such damages payment;" or, alternatively, (iii) "using a one-time specified cash payment for certain class members in certain categories."[56] Genworth also agreed to pay the class counsel attorneys' fees, litigation costs, and service costs.[57] Genworth denied any wrongdoing or legal liability of any kind under the settlement.[58]

The Skochin Court approved the Settlement Agreement in November of 2020, granting the plaintiffs' motion for class counsel attorneys' fees with an elimination of the $10 million

---

[51] *Id.* ¶ 46.
[52] *Id.* ¶ 48.
[53] *Id.* ¶ 53.
[54] *Id.* ¶ 54.
[55] *Id.*
[56] *Id.* ¶ 55.
[57] *Id.* ¶ 56. The class counsel attorneys' fees were calculated with a specific formula ($2 million plus an amount equal to 15% of the cash damages paid to the settlement class, subject to a $10 million floor and $24.5 million cap). The class counsel litigation costs were capped at $75,000. Service fees were capped at $25,000 for each of the three named class plaintiffs.
[58] *Id.* ¶ 57.

floor, granting the $25,000 service fees per named class plaintiff, and approval of litigation costs totaling $64,398.66.[59] As of May 2022, Genworth has paid over $8.6 million in defense costs arising from the Skochin Action.[60] Under the Skochin Settlement, Genworth paid approximately $26.5 million in class counsel attorneys' fees, more than $213 million in cash damage payments to the Skochin class members, $75,000 in service fees, and $64,398.66 in class counsel litigation costs.[61]

### 2. The Halcom Action

On January 11, 2021, Judy Halcom, Hugh Penson, Harold Cherry, and Richard Landino (the "Halcom Plaintiffs") filed a class action lawsuit against Genworth ("Halcom Action"). The Halcom Plaintiffs contended that Genworth failed to disclose the possibility of future premium increases at the time they entered into an LTC policy with Genworth.[62] The Halcom Plaintiffs alleged that, while they paid steady premiums for the first few years of their LTC policies, Genworth began obtaining large premium increases, with 11-12% premium increases in 2008, and another 18% premium increase by 2010.[63] By 2012, the Halcom Plaintiffs claimed that Genworth applied premium increases ranging from 60-95% for PCS I policies, and 63-78% increases for PCS II policies.[64] The Halcom Plaintiffs contended that Genworth failed to "tell policyholders the full scope of planned rate increases" in its communications to the policyholders regarding premium increases, and also failed to disclose that there would be further significant premium increases planned for the future.[65]

---

[59] *Id.* ¶ 59.
[60] *Id.* ¶ 61.
[61] *Id.*
[62] *Id.* ¶ 62. The Halcom Plaintiffs purchased PCS I (issued between 1994-97) and PCS II (issued between 1997 to 2001) LTC policies from Genworth.
[63] *Id.* ¶ 65.
[64] *Id.* ¶ 66.
[65] *Id.* ¶ 67.

As in the Skochin Action, the Halcom Plaintiffs did not contest the amount or extent of Genworth's premium increases, or Genworth's right to make such increases.[66] The Halcom Plaintiffs only challenged Genworth's alleged failure to disclose such anticipated additional increases to its policyholders.[67] The Halcom Plaintiffs sought compensatory, consequential, and general damages.[68]

On August 23, 2021, the Halcom Action parties filed an executed proposed settlement agreement (the "Halcom Settlement").[69] The Halcom Settlement was substantially similar to the Skochin Settlement, with Genworth agreeing to send a "Special Election Letter" to all of the settlement class members providing various disclosures about future rate increases and the financial condition of Genworth.[70] Additionally, Genworth offered several "Special Election Options" that the class members could choose in light of the disclosures regarding future premium increases.[71] As in the Skochin Settlement, one of the Special Election Options was a "damages payment" which was measured in different ways, including (i) a calculation of "premiums paid previously;" (ii) "future reduced benefit premiums as a basis for calculating such damages payment;" or, alternatively, (iii) "using a one-time specified cash payment for certain class members in certain categories."[72] Genworth also agreed to pay the class counsel attorneys' fees, litigation costs, and service costs.[73] Under the Halcom Settlement, Genworth

---

[66] Id. ¶ 68.
[67] Id.
[68] Id. ¶ 71.
[69] Id. ¶ 72.
[70] Id. ¶ 73.
[71] Id.
[72] Id. ¶ 74.
[73] Id. ¶ 76. The class counsel attorneys' fees were calculated with a specific formula ($1 million plus an amount equal to 15% of the cash damages paid to the settlement class, subject to a cap of $18.5 million). The class counsel' litigation costs were capped at $50,000. Service fees were capped at $15,000 for each of the four named class plaintiffs.

denied any wrongdoing or legal liability of any kind and denied that the lawsuit was appropriate for class treatment.[74]

On June 29, 2022, the Halcom Court granted a Final Judgment and Order of Dismissal with Prejudice giving the final approval of the Halcom Settlement.[75] Genworth estimates that the anticipated total value of the settlement payouts could range from between $84 million and $251 million.[76] As of May 2022, Genworth has paid $1.3 million in defense costs for the Halcom Action, and "expects that it will incur "substantial amounts in defense costs, damages payments and class counsel attorneys' fees going forward for the Halcom Action."[77]

### 3. The Haney Action

On January 28, 2022, Fred Haney, Marsha Merrill, Sylvia Rausch, Stephen Swenson, and Alan Wooten (the "Haney Plaintiffs") filed a class action lawsuit against Genworth ("Haney Action"). The Haney Plaintiffs contended that Genworth substantially increased premium rates for Choice 2, Choice 2.1, California CADE, California Reprice, and California Unbundled Long-Term Care Insurance policies ("Choice 2/2.1 Policies") without disclosing material information related to potential rate increases Genworth expected or planned to make in the future.[78] Similar to the Skochin and Halcom Actions, the Haney Plaintiffs claimed that while they paid stable premiums for the first few years of their Genworth LTC policies, by 2012, Genworth began requesting, and received approvals for, sharp increases in the policy premiums from the state regulators.[79] The Haney Plaintiffs maintained that Genworth failed to disclose to its policyholders the expected need for Genworth to seek the premium increases from the state

---

[74] *Id.* ¶ 77.
[75] *Id.* ¶ 79.
[76] *Id.* ¶ 75. The exact amount of the settlement payouts cannot be accurately calculated until all class members select their benefit options.
[77] *Id.* ¶ 80
[78] *Id.* ¶ 83. Choice 2/2.1 Policies were sold between 2003 and 2012.
[79] *Id.* ¶ 86.

regulators, and that Genworth failed to inform the policyholders of the "full scope of planned rate increases . . . or that Genworth was planning to ask for significant additional rate increases in the future."[80] "Like in the Skochin Action and the Halcom Actions, the Haney Plaintiffs did not challenge the amount or extent of Genworth's premium increases, or Genworth's right to make such increases, only Genworth's alleged failure to disclose such anticipated additional increases to its policyholders."[81]

In January 2022, the Haney Action parties agreed to a settlement in principle, and on July 5, 2022, the parties filed an Amended Joint Stipulation of Class Action Settlement and Release, which was approved by the Haney Court on July 7, 2022.[82] As of May 2022, Genworth has paid nearly $400,000 in defense costs in the Haney Action, and expects that it will incur "substantial amounts in additional defense costs, damages payments and class counsel attorneys' fees going forward."[83]

## F. DENIAL OF COVERAGE FOR THE SKOCHIN, HALCOM, AND HANEY ACTIONS

Genworth notified the Insurers about the Skochin Action and the incurred damages arising from the lawsuit on or about January 25, 2019.[84] On September 12, 2019, AIG asserted that coverage for the Skochin Action was barred under three policy exclusions under the Primary Policy – the Underwriting Exclusion; the Claim Reserves Exclusion; and the Premiums Exclusion.[85] On October 18, 2019, Axis denied coverage for the Skochin Action based on the same three policy exclusions raised by AIG, as well as an additional exclusion for Loss from a Claim.[86] On November 18, 2019, U.S. Specialty also denied coverage for the Skochin Action

---

[80] *Id.* ¶ 88.
[81] *Id.* ¶ 89.
[82] *Id.* ¶ 93.
[83] *Id.* ¶ 94.
[84] *Id.* ¶ 96.
[85] *Id.* ¶ 97.
[86] *Id.* ¶ 100.

and adopted the same positions as Axis.[87] On November 23, 2020, Ace denied coverage for the Skochin Action and adopted AIG's coverage position.[88] The other Insurers did not acknowledge coverage for the Skochin Action at the time Genworth filed this suit.[89]

On or about January 19, 2021, Genworth notified the Insurers about the Halcom Action and the incurred damages arising from that lawsuit.[90] On February 5, 2021, AIG asserted that coverage for the Halcom Action was barred under the same three exclusions AIG had raised in the rejection of coverage for the Skochin Action, and that AIG would consider the claim for the Halcom Action as being first made during the 2018-2019 policy period because it was related to the Skochin Action.[91] ACE, Axis, and U.S. Specialty adopted the same position for denying coverage for the Halcom Action.[92]

Genworth notified the Insurers of the pre-suit mediation request from the Haney Plaintiffs on or about November 5, 2021 and, again, on December 28, 2021.[93] On January 11, 2022, AIG denied coverage for the Haney Action and asserted the same three exclusions it asserted for non-coverage of the Skochin and Halcom Actions.[94] Atlantic Specialty, ACE, and CNA adopted AIG's position on the Haney Action, and also denied coverage.[95]

## G. PRESENT LITIGATION

On September 21, 2022, Genworth filed its Amended Complaint asserting three claims: (i) Breach of Contract and/or Anticipatory Breach of Contract Against All Defendants for Defense Costs; (ii) Breach of Contract and/or Anticipatory Breach of Contract Against All

---

[87] *Id.* ¶ 101.
[88] *Id.* ¶ 102.
[89] *Id.* ¶ 106.
[90] *Id.* ¶ 108.
[91] *Id.* ¶ 110.
[92] *Id.* ¶¶ 112-115.
[93] *Id.* ¶ 118.
[94] *Id.* ¶ 120.
[95] *Id.* ¶¶ 121-123.

Defendants for Indemnity; and (iii) Declaratory Relief Against All Defendants.[96] On October 3, 2022, Genworth filed its Motion for Partial Summary Judgment Dismissing Certain Insurer Coverage Defenses.[97] On December 1, 2022, Insurers filed its Motion for Summary Judgment.[98] On January 25, 2023, Genworth filed its Combined Memorandum of Law 1) In Opposition to Defendants' Cross-Motion for Summary Judgment, 2) In Further Support of its Motion for Partial Summary Judgment, and 3) In Opposition to Insurers' 56(f) Affidavit.[99] On March 8, 2023, Insurers filed its Reply in Further Support of Their Cross-Motion for Summary Judgment.[100]

The Court held a hearing on the Genworth Motion and the Insurers Motion on June 22, 2023. After hearing from the parties, the Court took the matters under advisement.[101]

## III. PARTIES' CONTENTIONS

### A. THE GENWORTH MOTION

Genworth argues that the three exclusions to coverage asserted by the Insurers do not bar coverage for the defense and settlement costs arising from the Skochin, Halcom, and Haney Actions (collectively, the "Underlying Actions"). Genworth maintains that the losses incurred by Genworth in the Underlying Actions "fall squarely within and satisfy all the elements of the insuring agreements of Genworth's policies."[102] Genworth asserts that Insurers rely on erroneous interpretations of the exclusions to argue that: (i) Genworth's losses either constitute premiums or return of premiums; (ii) Genworth's losses are related to the inadequacy of its

---

[96] D.I. No. 62.
[97] D.I. No. 63.
[98] D.I. No. 67.
[99] D.I. No. 71.
[100] D.I. No. 72.
[101] D.I. No. 96.
[102] Genworth's Motion for Partial Summary Judgment ("Genworth Motion") at 2 (D.I. No. 64).

claims reserves; or (iii) the Underlying Actions are attributable to issues in the underwriting of the LTC policies in question.[103]

## B. THE INSURERS MOTION

Insurers counter and argue that the Court should grant summary judgment in their favor. The Insurers contend that the facts show that there are no genuine issues of material fact as to the applicability of the Claim Reserves Exclusion under the Policies.[104] The Insurers claim that the plain reading of the clause bars coverage for Genworth's losses arising from the Underlying Actions.[105] The Insurers state that Genworth's premium increases were a result of "substantial shortfall in [Genworth's] LTC reserves," and that the Underlying Actions were "based upon, arising out of or attributable" to the inadequacies of Genworth's claim reserves, triggering the Claim Reserves Exclusion.[106] As such, Genworth's defense costs and settlement payments are not covered under the Policies as a matter of law.[107]

The Insurers alternatively argue that even if they are not entitled to summary judgment on the Claim Reserves Exclusion clause, or the Premium Exclusion clause, the Insurers are entitled to discovery. The Insurers contend that discovery is required to determine whether Genworth's settlement damages and costs arising from the Underlying Actions included "return of premiums" paid by the class members, which would trigger the Premiums Exclusion under the Policies.[108]

Furthermore, the Insurers argue that genuine issues of material fact remain as to the applicability of the Underwriting Exclusion, and discovery is necessary to find whether

---

[103] *Id.* at 3-5.
[104] Insurers' Combined Opening Brief in Support of Their Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Partial Summary Judgment ("Insurers Motion") at 3 (D.I. No. 67).
[105] *Id.*
[106] *Id.*
[107] *Id.* at 4.
[108] *Id.* at 32.

Genworth made certain decisions as to the need to seek significant future premium increases as a part of the underwriting process for the LTC policies.[109]  As such, the Insurers argue that the Court should deny Genworth's motion for partial summary judgment.

## IV.    STANDARD OF REVIEW

The standard of review on a motion for summary judgment is well-settled.  The Court's principal function when considering a motion for summary judgment is to examine the record to determine whether genuine issues of material fact exist, "but not to decide such issues."[110] Summary judgment will be granted if, after viewing the record in a light most favorable to a nonmoving party, no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law.[111]  If, however, the record reveals that material facts are in dispute, or if the factual record has not been developed thoroughly enough to allow the Court to apply the law to the factual record, then summary judgment will not be granted.[112]  The moving party bears the initial burden of demonstrating that the undisputed facts support his claims or defenses.[113]  If the motion is properly supported, then the burden shifts to the non-moving party to demonstrate that there are material issues of fact for resolution by the ultimate fact-finder.[114]

"These well-established standards and rules equally apply [to the extent] the parties have filed cross-motions for summary judgment."[115]  Where cross-motions for summary judgment are

---

[109] *Id.* at 33.
[110] *Merrill v. Crothall-American Inc.*, 606 A.2d 96, 99-100 (Del. 1992) (internal citations omitted); *Oliver B. Cannon & Sons, Inc. v. Dorr-Oliver, Inc.*, 312 A.2d 322, 325 (Del. Super. 1973).
[111] *Id.*
[112] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962); *see also Cook v. City of Harrington*, 1990 WL 35244, at *3 (Del. Super. Feb. 22, 1990) (citing *Ebersole*, 180 A.2d at 467) ("Summary judgment will not be granted under any circumstances when the record indicates . . . that it is desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances.").
[113] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979) (citing *Ebersole*, 180 A.2d at 470).
[114] *See Brzoska v. Olsen*, 668 A.2d 1355, 1364 (Del. 1995).
[115] *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692, at *5 (Del. Super. Jan. 31, 2019) (citations omitted); *see Capano v. Lockwood*, 2013 WL 2724634, at *2 (Del. Super. May 31, 2013) (citing *Total Care Physicians, P.A. v. O'Hara*, 798 A.2d 1043, 1050 (Del. Super. 2001)).

filed and neither party argues the existence of a genuine issue of material fact, "the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions."[116] But where cross-motions for summary judgment are filed and an issue of material fact exists, summary judgment is not appropriate.[117] To determine whether there is a genuine issue of material fact, the Court evaluates each motion independently.[118] And again, where it seems prudent to make a more thorough inquiry into the facts, summary judgment will be denied.[119]

## V. DISCUSSION

After reviewing the relevant documents and hearing from the parties, the Court will grant the Genworth Motion as to the Claims Reserves and Underwriting Exclusions. The Court does find that there are genuine issues of material fact as to the applicability of the Premiums Exclusion. The Court will **DENY** the Insurers Motion.[120]

### A. APPLICABLE VIRGINIA LAW

Under Virginia law, "[e]xclusionary language in an insurance policy will be construed most strongly against the insurer and the burden is upon the insurer to prove that an exclusion applies."[121] "[I]t is incumbent upon the insurer to employ exclusionary language that is clear and

---

[116] Del. Super. Ct. Civ. R. 56(h).

[117] *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. June 19, 2017), *aff'd sub nom., Motors Liquidation Co. DIP Lenders Tr. v. Allstate Ins. Co.*, 191 A.3d 1109 (Del. 2018); *Comet Sys., Inc. S'holders' Agent v. MIVA, Inc.*, 980 A.2d 1024, 1029 (Del. Ch. 2008); s*ee also Anolick v. Holy Trinity Greek Orthodox Church, Inc.*, 787 A.2d 732, 738 (Del. Ch. 2001) ("[T]he presence of cross-motions 'does not act per se as a concession that there is an absence of factual issues.'" (quoting *United Vanguard Fund, Inc. v. TakeCare, Inc.*, 693 A.2d 1076, 1079 (Del. 1997))).

[118] *Motors Liquidation*, 2017 WL 2495417, at *5; *see Fasciana v. Elec. Data Sys. Corp.*, 829 A.2d 160, 167 (Del. Ch. 2003).

[119] *Ebersole*, 180 A.2d at 470-72; *Pathmark Stores, Inc. v. 3821 Assocs., L.P.*, 663 A.2d 1189, 1191 (Del. Ch. 1995).

[120] As both Motions heavily overlap in their arguments regarding the applicability of the three exclusions, this discussion section will address both Motions for conciseness.

[121] *Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 547 (Va. 1989) (citing *Johnson v. Insurance Co. of North America,* 350 S.E.2d 616, 619 (Va. 1986)).

unambiguous."[122]  Ambiguity of a policy term must be found "on the face of the policy."[123] Language can be found to be ambiguous when "it may be understood in more than one way or when it refers to two or more things at the same time."[124]  "[D]oubtful, ambiguous language in an insurance policy will be given an interpretation which grants coverage, rather than one which withholds it."[125]

When determining whether an insurer has a duty to defend its insured, Virginia courts apply the "eight corners rule," which compares the four corners of the insurance policy against the four corners of the underlying complaint.[126]  "If any of the allegations may potentially be covered by the policy, the insurer has a duty to defend."[127]

## B. THE CLAIM RESERVES EXCLUSION DOES NOT BAR COVERAGE.

The Insurers argue that the Claim Reserves Exclusion precludes coverage for Genworth's settlement payouts and related costs and fees because the Underlying Actions were "based upon, arising out of or attributable . . . to the inadequacy of" Genworth's claim reserves.[128]  The Insurers contend that each of the Underlying Actions' complaints repeatedly refer to Genworth's alleged inadequate claims reserves for the LTC policies as the motive for Genworth increasing the LTC premium rates.[129]  In turn, the Insurers claim that "but for" Genworth's insufficient reserves, Genworth would not have had to omit "material information" from the LTC policyholders that it would be seeking additional future rate increases, giving rise to the Underlying Actions.[130]  As such, Insurers assert that the Claim Reserves Exclusion bars

---

[122] *Id.* (citing *State Farm Mutual Ins. Co. v. Gandy*, 383 S.E.2d 717, 719 (Va. 1989)).
[123] *Id.* (citing *Nationwide Mutual Ins. Co. v. Wenger*, 278 S.E.2d 874, 877 (Va. 1981)).
[124] *Id.* (citing *Lincoln National Life Ins. Co. v. Commonwealth Container Corp.*, 327 S.E.2d 98, 101 (Va. 1985)).
[125] *Id.* (citing *St. Paul Ins. v. Nusbaum & Co.*, 316 S.E.2d 734, 736 (Va. 1984)).
[126] *Erie Ins. Exchange v. State Farm Mut. Auto. Ins. Co.*, 2002 WL 32075410, at *5 (Va. Cir. Ct. Dec. 16, 2002).
[127] *Penn. Nat. Mut. Cas. Ins. Co. v. Block Roofing Corp.*, 754 F. Supp. 2d 819, 822-23 (E.D. Va. 2010).
[128] Insurers Motion at 18.
[129] *Id.* at 19-22.
[130] *Id.* at 7, 23.

recovery because the settlement payments and defense costs are not only "based upon, arising out of or attributable . . . to the inadequacy of [Genworth's] claim reserves."[131]  The Insurers conclude that "Genworth's inadequate claim reserves were part of the foundation for the Underlying Actions ("based upon"); they were part of the causal chain leading to the underlying plaintiffs filing suit ("arising out of"); and the Underlying Actions are capable of being explained as occurring in consequence of Genworth's inadequate claim reserves ("attributable to")."[132]

Genworth argues that the Court should find the Claim Reserves Exclusion does not bar recovery because Genworth's potential liability in the Underlying Actions was predicated solely upon Genworth's alleged misrepresentations or omissions regarding planned future premium increases.[133]  As Genworth states, "any background allegations regarding Genworth's reserves were merely contextual, and not a necessary element of Genworth's liability in the Actions, as required under Virginia law."[134]  Genworth notes that mere allegations and "incidental" claims to the underlying class plaintiffs' causes of action are insufficient to trigger the Claim Reserves Exclusion, as there was no actual occurrence of Genworth failing to pay out claims due to inadequate claim reserves.[135]  Genworth summarizes that the "[class] plaintiffs did not need to prove that Genworth's reserves were *actually inadequate*, as either a legal or factual matter, in order to establish liability in the Actions . . . Genworth's liability turned on the scope and adequacy of its rate increase disclosures."[136]

---

[131] *Id.* at 25.
[132] *Id.* at 25.
[133] Genworth's Combined Memorandum of Law 1) In Opposition to Defendants' Cross-Motion for Summary Judgment, 2) In Further Support of Its Motion for Partial Summary Judgment, and 3) In Opposition to Insurers' 56(f) Affidavit ("Genworth Opp.") at 19 (D.I. No. 71).
[134] *Id.* at 26.
[135] *Id.* at 29.
[136] *Id*. (emphasis in original).

A plain reading of the Claim Reserves Exclusion demonstrates that the provision does not bar Genworth's claims. The Claim Reserves Exclusion states:

> [Insurers] shall not be liable for that portion of **Loss** on account of any **Claim** made against any **Insured** based upon, arising out of or attributable to (i) the inadequacy of any claim reserves of the **Company** or any entity to which the **Insureds** provide **Professional Services**; or (ii) the bankruptcy, insolvency, receivership, liquidation or financial inability of any entity to which the **Insureds** provide **Professional Services** to pay claims or perform **Professional Services**.[137]

The Claims Reserve Exclusion, in its entirety, provides that the Insurers are not liable for losses related to claims made against Genworth "based upon, arising out of or attributable to" either the inadequacy of Genworth's claim reserves, or the general financial insolvency of Genworth. In other words, "Losses" incurred by Genworth must be directly attributable to Genworth's inability to pay claims to its insureds because Genworth either failed to maintain sufficient claim reserves, or because of Genworth's financial insolvency. Even under a broad reading of the clause, the Claim Reserves Exclusion language does not implicate barring recovery for Genworth's "Losses" even if claims made by policyholders suggest that inadequacy of claims reserves was a motivator or factor for Genworth's failure to disclose planned premium increases from its LTC policyholders.

Furthermore, the Insurers rely on *James River Ins. Co. v. Doswell Truck Stop, LLC* to argue that under Virginia law, the language "arising out of" does not require a direct link between a "liability" and a "violation" to implicate an exclusionary clause, and that only a "reasonable causal connection" is required to trigger the clause.[138] However, a careful reading of *James River* strongly suggests that the Virginia Supreme Court did not intend on its interpretation of the language, "arising out of" to be applied beyond the immediate facts

---

[137] *Id.* at 26 (emphasis in original).
[138] Insurers Motion at 27-28 (citing *James River Ins. Co. v. Doswell Truck Stop, LLC*, 827 S.E.2d 374, 377 (Va. 2019)).

presented in that case, and thus, the Court will not adopt the interpretation proffered by Insurers.[139]

In each of the Underlying Actions, the class plaintiffs asserted claims alleging that Genworth made misleading and inadequate disclosures regarding premium rate increases at the time they entered into Genworth's LTC policies.[140] The class plaintiffs' complaints also stated that "[t]his case does not challenge Genworth's right to increase these premiums or the need for premium increases given changes in certain of Genworth's actuarial assumptions."[141]

As Genworth also points out, the Halcom Court noted in its memorandum opinion approving the Halcom Settlement that "concerns related to Genworth's actuarial decisions and its long-term prospects for business success . . . [are] beyond the scope of this case."[142] While the class plaintiffs may have offered theories or evidence as to Genworth's inadequate reserves as a motive or cause for increasing the LTC policy premium rates, it was not asserted as a claim against Genworth in the class plaintiffs' case-in-chief.

In conclusion, the Court reads the plain language of the Claim Reserves Exclusion to mean that the Insurers are not liable for Genworth's losses if such losses arise from the inadequacy of Genworth's claim reserves. Mere allegations or background facts tangentially relating to Genworth's claim reserves are insufficient to trigger the exclusion. At best, the

---

[139] The *James River* case involved a plaintiff who was injured on the premises of the defendant's truck stop and repair garage due to an overinflated tire exploding near the plaintiff. The defendant was insured under a general commercial liability policy which excluded coverage for bodily injury arising out of the maintenance of any automobile on the truck stop premises. The *James River* court found that the auto exclusion clause language, "arising out of the ownership, maintenance or use" should be interpreted broadly, and following *State Farm Mut. Auto. Ins. Co. v. Powell*, 318 S/E/2d 393. 397 (Va. 1984), only a "reasonable causal connection" needed to exist between the maintenance or use of an automobile and the injury in question to trigger the exclusion and deny coverage for the plaintiff's injury. The *James River* court did not provide for its interpretation of "arising out of" language to be applied wholesale in any and all insurance dispute cases beyond specific situations involving bodily injuries arising from maintenance or use of automobiles, and liability coverage exclusion clauses.
[140] Amend. Compl. ¶¶ 2-4.
[141] Genworth Opp. at 19, Ex. 11 ¶ 1; Exs. 22 & 23 ¶ 3.
[142] *Id.* at 19, Ex. 26 at 43.

language of the Claim Reserves Exclusion can be found to be ambiguous on whether supporting allegations or claims contained within the Underlying Actions' complaints are sufficient to trigger the clause. However, under Virginia law, exclusionary language in an insurance policy must be "construed most strongly against the insurer and the burden is upon the insurer to prove that an exclusion applies"[143] and "doubtful, ambiguous language in an insurance policy will be given an interpretation which grants coverage, rather than one which withholds it."[144]

The Court finds that Insurers failed to overcome the burden of showing that Genworth's claims should be barred from coverage on the basis of the Claim Reserves Exclusion. As such, the Court will GRANT the Genworth Motion as to the Claims Reserve Exclusion.

### C. THE UNDERWRITING EXCLUSION DOES NOT BAR COVERAGE.

The Insurers contend that there are genuine factual disputes as to whether the Underlying Actions are "based upon, arising out of or attributable to the underwriting of insurance, including any decisions involving the renewal of risks as well as the rates and premiums charged to insure or reinsure risks."[145] The Insurers assert that the Underlying Actions' central allegations were based on Genworth's decisions regarding the rates and premiums of the LTC plans, as well as its failure to disclose significant premium increases.[146] The Insurers then argue that Genworth's inadequate disclosures to the class plaintiffs were material to the "renewal" of the LTC policies, and the rates and premiums charged by Genworth for those policies.[147] As such, the Insurers claim that the Underwriting Exclusion applies here because Genworth's losses from the Underlying Actions were based upon its decisions involving the renewal of risks, and the rates

---

[143] *Am. Reliance Ins. Co. v. Mitchell*, 385 S.E.2d 583, 547 (Va. 1989) (citing *Johnson v. Insurance Co. of North America,* 350 S.E.2d 616, 619 (Va. 1986)).
[144] *Id.* (citing *St. Paul Ins. v. Nusbaum & Co.*, 316 S.E.2d 734, 736 (Va. 1984)).
[145] Insurers Motion at 33.
[146] *Id.*
[147] *Id.*

and premiums charged for the policies.[148]  In support, the Insurers note that the complaints of the Underlying Actions use variants of the words "renewal," "rate," and "premium" "over 400 times" which evince the fact that the underwriting of the LTC policies was central to the Underlying Actions.[149]

The Insurers also argue that, at the minimum, the Court should deny the Genworth Motion on this issue and permit discovery to go forward in order to "shed light on when and how Genworth decided what rates and premiums to charge, as well as what role rates, premiums, and renewables played in the underlying plaintiffs' cases…."[150]  The Insurers also contend they need discovery on whether the Underlying Actions arose out of "the sale and marketing of insurance . . . products" which are excluded from the Underwriting Exclusion.[151]

Genworth argues that the Underwriting Exclusion does not apply as a matter of law because the Underlying Actions only involved claims related to the "sale and marketing" of the LTC policies in question.[152]  Genworth contends that the Underlying Actions were brought on the sole basis of Genworth's alleged misrepresentation and false marketing of the LTC policies regarding the undisclosed premium increases at the time the policies were sold to the policyholders.[153]  Genworth points out that the class plaintiffs argued they were harmed as a result of Genworth's marketing material as to the LTC policies, and that "plaintiffs purchased and/or renewed their LTC policies based on Genworth's market materials and allegedly incomplete information about premium increases."[154]

---

[148] *Id.*
[149] *Id.* at 34.
[150] *Id.* at 36.
[151] *Id.*
[152] Genworth Opp. at 43.
[153] *Id.* at 44.
[154] *Id*. at 44, Ex. 22 ¶¶ 8-10, 59-62; Ex. 28 ¶ 58 ("Genworth 'marketed its experience and financial condition to induce new policyholders to purchase LTC policies and to keep its LTC policyholders renewing their policies.'").

Additionally, Genworth asserts that the class plaintiffs never alleged any wrongdoing in Genworth's underwriting practices, and "expressly did not challenge Genworth's ability to raise premiums or the propriety of those projected increases."[155] Genworth also notes that under Virginia law, mere references in the underlying complaints to "renewals," "rate," or "premiums," do not preclude coverage, as the underwriting of the policies itself must be a required or necessary element for liability in the Underlying Actions.[156] Genworth asks the Court to reject the Insurers' broad reading of the provision, and argues that the exclusion is much narrower, only applying to "errors made in the underwriting process itself – i.e. at the business risks Genworth itself assumes each time it issues a policy…."[157] Genworth maintains that the exclusion "does not apply to subsequent errors or claims of wrongdoing that allegedly occurred outside that process."[158]

The Court does not find this to be a complicated issue. A plain reading of the Underwriting Exclusion provides that the Insurers are not liable for covering any Loss related to the underwriting of insurance policies, or decisions made by Genworth involving the "classification, selection, and renewal of risks as well as the rates and premiums charged to insure or reinsure risks."[159] Most importantly, the Underwriting Exclusion explicitly provides that *it does not apply to Claims arising out of the "sale and marketing of insurance or investment products*."[160]

The Underlying Actions involved class action lawsuits against Genworth for alleged false and misleading marketing of their LTC policies and failure to disclose planned future premium

---

[155] Genworth Opp. at 46.
[156] *Id.*
[157] *Id.* at 48.
[158] *Id*.
[159] Primary Policy at 24.
[160] *Id.* (emphasis added).

26

increases. The Underlying Actions do *not* involve any allegations attributable to the underwriting of the policies, or the decisions made during the underwriting of the policies as to the rates and premiums charged to insure or reinsure risks. Upon review of the Underlying Actions, it is evident that the claims made by the class plaintiffs, and the resulting losses to Genworth from settling the Underlying Actions, can only be attributed to the "sale and marketing of insurance" products, which are expressly not covered by the Underwriting Exclusion. The Court finds that there are no genuine issues of material fact as to the applicability of the Underwriting Exclusion. The Court also finds that no amount of discovery would alter the facts of the Underlying Actions to fit the arguments presented by Insurers on this issue.

Accordingly, the Court will **GRANT** Genworth's motion as to the Underwriting Exclusion.

### D. THERE ARE GENUINE ISSUES OF MATERIAL FACT AS TO THE APPLICABILITY OF THE PREMIUMS EXCLUSION.

The Insurers argue that Genworth is not entitled to partial summary judgment as to the Premiums Exclusion because there are genuine issues of material fact as to whether the settlement payments constitute premiums or return premiums. Insurers plead that they are entitled to discovery on how the settlement payments were negotiated and whether the payments include a return of LTC premiums.[161]

The Insurers contend that under the Policies, when any loss consists of premiums or return premiums, that loss is excluded from coverage under the Premiums Exclusion.[162] The Insurers point out that in all three of the Underlying Actions, the class plaintiffs sought a "return of premiums paid for each year a renewal of the policy was rescinded."[163] The Insurers also note

---

[161] Insurers Motion at 43-44.
[162] *Id.* at 37.
[163] *Id.*

that even Genworth's own initial disclosures in the Underlying Actions admitted the fact that the plaintiffs were seeking "compensatory damages, which will be calculated as a refund of premiums."[164]

The Insurers also contest Genworth's arguments that the Premiums Exclusion does not bar coverage for Genworth's defense costs, class counsel attorneys' fees, and settlement payments arising from the Underlying Actions. First, the Insurers argue that while the language of the Premium Exclusion does state that it does not apply to defense costs, the Insurers point out that the claimed defense costs of Genworth are only $10 million, which does not exceed the $25 million retention amount as per the Policies.[165] Second, the Insurers contend that the class counsel attorneys' fees were awarded under a "constructive common fund" doctrine, meaning that the class counsel fees were a "hold-back from the payments Genworth made to class members" and, as such, all of the payments made under the settlement agreements constitute a return of premiums.[166] In other words, the Insurers maintain that the Premium Exclusion bars recovery for the class counsel attorneys' fees because (i) the settlement payments arising out of the Skochin, Halcom, and Haney Settlements consisted of a return of premiums; and (ii) the class counsel attorneys' fees were paid out from that return of premiums.

Lastly, the Insurers rely on language from the Skochin Court regarding settlement. The Insurers not that, despite Genworth's assertions that the settlement payments were purely "cash damages," the Skochin Court referred to the settlement as involving the "partial refund of . . . premiums," despite later amending the statement.[167]

---

[164] *Id.* at 38.
[165] *Id.* at 39.
[166] *Id.* at 40.
[167] *Id.* at 42. The Skochin Court issued an order amending a portion of its settlement approval opinion which originally stated, "a partial refund of the premiums that the policyholder has already made" to instead read "cash damages." Genworth Motion at 25, Ex. 19.

The Insurers argue that at minimum, there are genuine issues of material fact related to whether the settlement payments consist of return of premiums already paid by the underlying action class members. The Insurers contend that discovery is necessary to resolve those issues of fact prior to the Court's decision on the Genworth Motion.[168]

Genworth argues that the Premiums Exclusion does not bar coverage for the Underlying Actions because the settlement payments and class counsel attorneys' fees do not constitute premiums or return premiums. Genworth disputes the Insurers' arguments that the class counsel attorneys' fees consisted of premiums or return premiums and that such fees were awarded under a "constructive common fund" doctrine.[169]

Genworth alerts the Court to the final terms of the settlement agreements that provide: "Genworth shall pay Class Counsel's reasonable attorneys' fees and litigation expenses, without reducing the benefit to any Settlement Class members."[170] Genworth maintains that these terms controvert Insurers' arguments as to the alleged "constructive common fund" scheme.[171] Genworth also relies upon the Notice of Pendency of Class Action and Proposed Settlement to support the conclusion that class counsel attorneys' fees were distinct from the settlement payouts. The Notice of Pendency of Class Action and Proposed Settlement states: "Class members will not be required to separately pay Class Counsel for any other attorneys' fees or expenses. Genworth has agreed to pay all fees and expenses separately."[172] Genworth argues that even if the Court were to find that the settlement payments constituted premiums or return premiums, the class counsel attorneys' fees would still be covered under the Policies as it was

---

[168] Insurers Motion at 43-44.
[169] *Id.* at 35.
[170] *Id.*
[171] *Id.*
[172] *Id.* at 36.

not commingled with the settlement payments, and was expressly designated as a separate payments and was to be made by Genworth.[173]

Additionally, Genworth states that the cash damages settlement payments do not constitute premiums or return premiums and that the Insurers failed to disprove a plethora of evidence showing that the settlement payments were general cash damages that are covered under the Policies. Genworth maintains that none of the briefings and orders related to the settlements included any language or references to a return of premiums paid by the class members.

Genworth also notes that the Underlying Actions' "Prayer[s] for Relief" specifically sought "compensatory, consequential, and general damages," and that the Skochin, Halcom, and Haney Courts never found that Genworth was either obligated to return premiums, or that class members were entitled to the return of premiums paid during the LTC policies.[174] Most importantly, Genworth presents the "smoking gun" evidence of the Skochin Court correcting its settlement approval order from stating that the settlement payment was a "refund of . . . premiums" to instead read that they were "Cash Damages."[175]

Here, on this record, the Court finds that genuine issues of material fact remain on this issue. The plain reading of the Premiums Exclusion provides that coverage for loss is barred when the loss constitutes premiums and return premiums.[176] Merriam-Webster defines "constitute" as "make up, form, compose."[177] Loss is found when claims are made against Genworth for "Wrongful Acts" which are defined as "any error, **misstatement, misleading**

---

[173] *Id.* at 37.
[174] *Id.* at 39.
[175] Genworth Opp. at 39.
[176] Primary Policy at 25.
[177] *Constitute*, Merriam-webster.com, https://www.merriam-webster.com/dictionary/constitute (last visited Sept. 20, 2023)..

**statement, act, omission**, neglect or breach of duty actually or allegedly committed" by Genworth.[178]

The language of the Premiums Exclusion is unambiguous – Genworth's loss is not covered by the Policies if the loss consists of premium payments being returned to the policyholders.

Upon review of the final settlement agreements, the Court finds that there is a genuine issue of material fact as to the make-up of the cash damages offered to the class member plaintiffs in the Underlying Actions. Here, the language of the final settlement agreements of the Underlying Actions dictates whether the "Loss" consisted of a return of premium payments to the class plaintiffs. The Settlement Agreements' Appendix C titled "Special Election Options," provides several alternatives for the class members to opt into, including:

1. A settlement option consisting of two components: (a) a paid-up benefit option equivalent to 100% of the Settlement Class member's paid-in premiums through December 31, 2015 plus the Settlement Class member's paid-in premiums paid on or after January 1, 2020, if any, less any claims paid over the lifetime of the policy, and (b) a damages payment equal to premiums paid during the time period beginning January 1, 2016 through December 31, 2019; or

2. A settlement option consisting of a paid-up benefit equal to two times the difference between the Settlement Class member's paid-in premiums to date less claims paid to the Settlement Class member to date. This option will not include any damages payment.[179]

The settlement payment options seem to suggests that certain portions of the settlement amounts could have been calculated by adding up amounts "equivalent to 100% of the Settlement Class member's paid-in premiums."[180] While Genworth argues that the final wording of the settlement payment terms provide these are "cash payments" to the class members, the

---

[178] Primary Policy at 20 (emphasis added).
[179] Genworth Motion, Ex. 14B.
[180] *Id.*

calculation of these "cash payments" appears to include calculating how much in premium payments were made by the class members during the relevant policy period, and returning those amounts back to the class members who opt for that alternative.

The language of the Premium Exclusion clause states that Insurers "shall not be liable for that portion of *Loss* on account of any **Claim** made against [Genworth] if such **Loss** constitutes: . . . (iii) premiums, return premiums."[181]  The Court thinks that Genworth's arguments on the Premium Exclusion are stronger.  The provision seems to exclude the business situation where Genworth has to return premiums and then seeks indemnification.  The Underlying Actions do not appear to seek the return of premiums.  However, the comment from the Skochin Court and the terms of the settlements creates an issue of fact.  In other words, the Court finds there are genuine issues of material fact as to whether portions of the settlement payments made to the Underlying Action class members consist of premiums or return premiums.  As such, the Court will **DENY** the Genworth Motion as to the Premium Exclusion.

## VI. CONCLUSION

For the foregoing reasons, the Genworth Motion is **GRANTED**, in part, as to the Claim Reserves Exclusion and the Underwriting Exclusion, and **DENIED**, in part, as to the Premium Exclusion.  The Insurers Motion is **DENIED**.

**IT IS SO ORDERED.**

September 21, 2023
Wilmington, Delaware

*/s/ Eric M. Davis*
**Eric M. Davis, Judge**

cc:     File&ServeXpress

---

[181] Primary Policy at 25.